## URBETEIT v. UNITED STATES.
### No. 12033.

Circuit Court of Appeals, Fifth Circuit.

Nov. 7, 1947.

H. O. Pemberton, of Tallahassee, Fla., for appellant.

John T. Grigsby and Vincent A. Kleinfeld, both of Washington, D. C., and George Earl Hoffman, U. S. Attorney, of Pensacola, Fla., for the United States.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

Under the Food, Drug, and Cosmetics Act of 1938, § 304, 21 U.S.C.A. § 334, 16 electrical machines or devices were seized for condemnation in Ohio as having been misbranded when shipped in interstate commerce from Tampa, Florida, by appellant Fred Urbeteit to J. J. H. Kelsch at Cincinnati. The misbranding was alleged

to consist in printed matter which accompanied them while in interstate commerce which was false and misleading in that it represented the machines as having therapeutic value in the diagnosis and treatment of stated diseases of man, whereas the devices were not effective for such purposes. Kelsch claimed 6 of them as his, and Urbeteit claimed 10 of them as belonging to himself but rented to Kelsch. After trial, the case by consent having been transferred to Florida, a judgment of condemnation and destruction was rendered, with recovery of some $1,150.64 costs. Urbeteit appeals.

The claims admit that 6 machines were sold by Urbeteit to Kelsch and shipped in interstate commerce as alleged, and that the 10 others were rented and shipped to Kelsch by express, and that the printed matter was at the request of Kelsch sent by Urbeteit to Kelsch by parcel post; but deny that it was a labeling of the machines or accompanied them, and deny that its statements are false and misleading. The testimony, in great volume, related mostly to the falsity of the statements. We consider first, however, whether there was a misbranding proven under the Act.

 Section 301(a, c), 21 U.S.C.A. § 331(a, c), prohibits the introduction into and the receipt in interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded, and Section 304 (a), 21 U.S.C.A. § 334(a), provides for seizure and condemnation of such. It is not denied that these machines were devices within the Act. By Section 502(a), 21 U.S.C.A. § 352(a), a drug or device shall be deemed to be misbranded if its labeling is false or misleading in any particular. A definition in Section 201, 21 U.S.C.A. § 321, which is the dictionary of the Act, is: "(m) The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." The last three quoted words are critical here. They make the term "labeling" broader than "label" as defined in paragraph (k), which includes only what is "display[ed] * * * upon the immediate container" of an article. How much broader? In United States v.

Research Laboratories, 9 Cir., 126 F.2d 42, it was held that printed matter which did not travel with the article but was sent by the same shipper to the same consignee and received at the same time for use in connection with the article, "accompanied" it. But the same court in Alberty v. United States, 9 Cir., 159 F.2d 278, refused so to hold when the printed matter and the article were shipped 2 months apart and not simultaneously. Accepting those decisions as sound, the latter controls here. It is shown that machines valued at $4,300 were shipped July 25, 1945; value $1,200 August 14; value $800 August 18; and value $1,-200 Sept. 21. Kelsch testified that he had an understanding with Urbeteit that he would mail him some printed matter before he finally contracted for the machines, and that the matter was received about September, after the machines were delivered. It was found by the inspectors in Kelsch's consultation room, the machines being all in other rooms, on Sept. 5. The claim alleges the printed matter was mailed Sept. 1. It did not "accompany" in any fair sense either shipment. Both the amended libel and the second amended libel allege that the false leaflets "accompanied said articles of device when said articles were introduced into and while said articles of device were in interstate commerce". This is the language of Section 304(a), the forfeiture provision of the statute, but it is shown not to be true of any shipment. The first 3 shipments went forward and were received by Kelsch, and put to work in his medical practice several weeks before any leaflets were sent. They did not accompany any of the devices while they were in interstate commerce. The last shipment went forward 3 weeks behind the leaflets, and was not accompanied by them. Accompany means to go along with. In a criminal and forfeiture statute the meaning cannot be stretched.

It may be doubted that the printed matter is in its nature a labeling for the machines. It looks like a small newspaper, entitled "The Road to Health, By Dr. Fred Urbeteit. Every subject pertaining to Health, Doctoring and Nursing is being taught at the College of Sinuothermic Institute, Inc., 307 West Euclid Ave., Tampa,

Florida". To the left of this heading is a picture of Dr. Fred Urbeteit, President of Sinuothermic Institute, Inc., and to the right an attractive picture of the Institute and its grounds. Fifteen columns of fine print are below, consisting of testimonials and case histories of patients who had been treated at the Institute by Dr. Urbeteit, with unstinted praise of both. The Sinuothermic machine is mentioned and praised as an instrument of diagnosis and treatment, but there is no description or picture of the machine or any explanation of its operation, or any suggestion that it is for sale. The whole thing appears to be an advertisement for the Institute and Dr. Urbeteit, rather than something to accompany machines. Dr. Urbeteit is licensed as a practitioner of naturopathy in Florida. Dr. Kelsch is a chiropractor in Ohio. Dr. Kelsch became interested in Dr. Urbeteit's work and took a three weeks course at the Institute, and on the strength of it, on returning to Ohio, bought some of the machines, and rented others. He re-rented one to a patient to use at home, and sold one to another patient who moved to another State. The literature apparently was intended to advertise himself as following the methods of Dr. Urbeteit, rather than to explain or sell machines. Whether we ought to hold it a labeling of these machines if shipped simultaneously with them may be doubted. But if it could be called labeling, it is not proved by the present skimpy evidence that it accompanied the machines or any of them while they were in interstate commerce.

Dr. Urbeteit vigorously contended that all he had said in "The Road to Health" was true. He offered in his claim, since no employee of the United States had any actual knowledge of his machine and only a few practitioners whom he had instructed, to conduct a series of tests of it in cooperation with practitioners of medicine, osteopathy, chiropractic, and naturopathy approved by the court, on persons preferably before treated by medical practitioners without success, they to be examined before and after the test by physicians appointed by the court, during such period as the court should fix, their findings of the results to be evidence in the case. This was not done. Dr. Urbeteit at least seems convinced of the efficacy of his machine. He testifies that he was himself a suffering and distorted victim of arthritis deformans, and was helped to a degree which he described in detail, and exhibited his diseased joints to the court. He describes the construction of his machine, claims peculiarities in the winding of the electrical transformers in it which experimentally he found to produce currents peculiarly affected by diseased or congested bodily tissues, which when measured indicate where the trouble is, although often remote from the pain and other symptoms, and that it aided in locating the cause of trouble; and that a modified type of machine also was useful in treating many ailments. He testified in detail as to each case mentioned in "The Road to Health". He had 30 of his patients present whom he offered as witnesses to the benefits they had received, many of them being those mentioned in "The Road to Health". The judge refused to hear them, on the ground that being laymen they could not testify what was the matter with them and consequently could not say what they were relieved from, and that the diagnoses testified to by Dr. Urbeteit could not be accepted because he rested them on the use of his machine which the Government's witnesses, who were men of high standing in medicine and in the electrical arts, had testified could not do what Dr. Urbeteit claimed. These rulings were error. One was based on the idea that Dr. Urbeteit had made his diagnoses solely on the indications of the machine. But his testimony as a whole was that he used all known methods of diagnosis, that the machine did not indicate any particular disease but only located the spot where the abnormal tissue was, and it was then a matter of judgment as to what the disease was. He only claimed the machine to be an aid in diagnosing. The patients themselves could certainly know whether their external symptoms abated and their pains ceased. Urbeteit, being a licensed doctor of some 20 years practice, could express expert opinions. The judge might, after hearing all the evidence, prefer the expert opinions of the Government witnesses to those of Dr.

Urbeteit, even as against the facts to which he and his witnesses might swear, but he should have heard all the competent testimony before making up his mind. The most eminent physicians and scientists have in the past erred in their opinions, and opinions generally must yield to well proven contrary facts. The case ought to have been more fully tried.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.